**Fred MAZANEC, Appellee-Plaintiff,**

v.

**AETNA INSURANCE COMPANY,
Appellant-Defendant.**

Supreme Court of Tennessee.

March 5, 1973.

Fred A. Kelly, Harsh, Kelly & Harsh, Gallatin, for appellee-plaintiff.

Lawrence E. Levine, Bernard M. Rosenblum, Levine & Rosenblum, Nashville, for appellant-defendant.

## OPINION

DYER, Chief Justice.

This is a workmen's compensation case presenting first the issue of the correctness

of the holding of the trial judge that the action of Fred Mazanec in refusing to submit to surgery offered by the insurance carrier of the employer was reasonable, and such refusal would not suspend the workmen's compensation benefits due employee.

T.C.A. § 50–1004 reads in pertinent part as follows:

> If the injured employee refuses to comply with any reasonable request for examination or to accept the medical or specialized medical services which the employer is required to furnish under the provisions of this law, his right to compensation shall be suspended and no compensation shall be due and payable while he continues such refusal.

This question was considered at length in Sullivan v. Green, 206 Tenn. 42, 331 S. W.2d 686 (1960), wherein the Court said:

> The question when compensation should be suspended because claimant refuses to submit to reasonable treatment or surgery is one of the most delicate medicolegal issues in the entire realm of workmen's compensation. Larson's Workmen's Compensation Law, Vol. 1, § 13.22.
>
> That the statute before us requires the claimant to undergo a surgical operation cannot be doubted. But in all such cases the claimant will not be penalized *if his refusal is reasonable.*
>
> " * * * The difficulty arises when 'reasonableness' has to be defined. The judgment usually resolves itself into a weighing of the probability of the operation's successfully reducing the disability by a significant amount, against the risk of the operation to the claimant. If the risk is insubstantial and probability of cure high, refusal will result in a termination of benefits. But if there is a real risk involved, and particularly if there is a real chance that the operation will result in no improvement or even perhaps in a worsening of the condition, the claimant cannot be forced to run the risk

at peril of losing his statutory compensation rights." Larson's, Vol. 1, § 13.22.

The foregoing fairly represents this Court's holding in our reported cases. Furthermore we feel that the Court should not undertake to solve the problem solely on medical statistics and expert testimony, although in some cases it might become necessary to do so. All medical experts agree (as did the doctors in the case at bar) that there is a small percentage of fatality in all major operations, while in many others the risk is substantial.

\* \* \* \* \* \*

In considering the question of the claimant's refusal to undergo a major operation of any kind where it is admitted to be a serious one, we think the viewpoint of the injured employee should be considered as well as attending surgeons. Of course, his fear of an operation is not controlling, but we must consider realistically if such fear is reasonably justified under all the facts. 206 Tenn. at 55–56, 58, 331 S.W.2d at 692.

 This determination of whether refusal is reasonable depends upon (1) objective appraisal of the gravity of the surgery, the risk involved, and the probability of success, and (2) an appraisal of the sincerity for the fears of the surgery expressed by the employee. This objective appraisal should consider advances in surgical procedures which reduce risks and enhance the prospects of success in some operations considered very dangerous several years ago.

The employee, while lifting a floor-jack weighing some seventy-five pounds, felt a ripping sensation in his chest and body and pain therefrom. This injury has been diagnosed as thoracic outlet syndrome, which was described in lay language by one of the doctors as follows:

> Well, thoracic means chest. Outlet means the part of the chest which lets out the vessels and nerves. Any syn-

drome means group of symptoms. So it means outlet of the chest where vessels and nerves run out having symptoms, and these symptoms were pain and numbness which he had told me. So we called this thoracic outlet syndrome. And usually this means pain, numbness, and sometimes motor weakness, which he did not apparently have. And sometime swelling.

This injury causes pain in the area of the chest radiating to the left arm where numbness occurred. The surgery required is the removal of part of the first rib to relieve pressure on an artery and by implication on the closely associated nerve.

Employee has been examined and advised by five physicians, whose testimony is in the record. Under this record there appears a serious reluctance by some of the examining physicians to first suggest a diagnosis, resulting in a pattern of referrals to obtain a better understanding of employee's problem.

One physician testified this surgery had a good success rate, but certainly not one hundred per cent; that of the patients suffering thoracic outlet syndrome eighty per cent recover without surgery, and of the twenty per cent requiring surgery, seventy per cent obtain complete relief.

Another physician testified there was always some disability after such surgery, but that surgery would at least reduce the disability.

The third physician testified he advised employee there was a good chance surgery would help the pain in his arm, but there was a good deal of doubt whether this would help the pain over his breastbone and upper portion of his left chest.

All physicians described the surgery as serious and such was avoided where non-operative therapy was satisfactory.

Employee testified the examining physicians made him aware of the risk and difficulty involved in the surgery, as well as the prospects of success.

Under review of the evidence on this issue, we find there is evidence to indicate there is some doubt as to probable success of the surgery in accomplishing a significant reduction in employee's disability. Also, there is evidence employee's fears of the operation was genuine and based in part on bad experiences with laboratory tests administered during various examinations for this injury.

While decision on this issue involves a complex fact question, and it is still a fact question, and here on appeal is subject to our well recognized rule that where there is material evidence to support the finding of the trial judge we will not disturb the finding, we think there is material evidence to support the finding that employee's refusal to undergo surgery was reasonable, and his benefits may not be terminated on the basis of this refusal.

The second issue raised is that there is no material evidence to support the trial judge's finding of permanent total disability. This assignment is based on the argument there is no expert medical proof regarding the permanent nature of the injury, and that such proof is necessary in this type of injury to sustain such finding.

In Minton v. Leonard, 219 Tenn. 642, 412 S.W.2d 886 (1967), the compensable injury was trauma to the back aggravating the prior nervous condition. This Court, in finding the permanency of such injury required expert medical testimony, said:

> This is not to say that in every case there must be expert medical testimony as to the permanency of the injury. In some cases it may be completely obvious that the injury is permanent, as where the Court in dealing with loss of a hand or there may be cases where lay testimony would establish the permanency of the injury. However, in the case at bar, we are dealing with a most complex disability, concerning which this Court is not competent to infer permanency. 219 Tenn. at 650–651, 412 S.W.2d at 889.

This requirement that there be expert medical testimony as to the permanency of the injury in certain cases has been reaffirmed in Floyd v. Tennessee Dickel Distilling Co., Tenn., 463 S.W.2d 684 (1971), and Phillips v. Fleetguard Division of Cummins Engine Co., Tenn., 480 S.W.2d 528 (1972).

█ The nature of the injury suffered by employee was such that lay evidence alone would not support an award of permanency, and such would require expert medical evidence.

The medical evidence is principally directed to the issues of the surgery to relieve the disability and the probabilities of success. There is no medical evidence on the issue of the permanent nature of the injury absent surgery.

█ It is incumbent upon the employee to carry the burden of proof to establish every essential element of his claim, including, if claimed, the permanency of his disability. Lunsford v. A. C. Lawrence Leather Co., 189 Tenn. 293, 225 S.W.2d 66 (1949).

The finding of the trial judge that the refusal of employee to submit to surgery was reasonable and did not operate to deny employee compensation benefits, and this finding is affirmed. The award by the trial judge of compensation benefits based upon permanent and total disability is reversed.

Under authority of T.C.A. § 27–309, the cause is remanded to the trial court for the purpose of taking proof as to the permanency of the disability, which, since the issues are so interlocked, will have to include the extent of any permanent disability. The permanency of the disability, due to the complex nature of the injury, will have to be proven by expert medical evidence. The extent of the disability is subject to both lay and medical proof. The trial judge after taking such proof as needed will award the compensation benefits due.

The costs in this Court will be divided equally between the parties.

CHATTIN, HUMPHREYS, McCANLESS, JJ., and WILSON, S. J., concur.